IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER GIPSON, | ) | CASE NO. 1:09-cv-862 |
| o/b/o H.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jennifer Gipson's application for Supplemental Security Income under Title XVI of the Social Security Act, §1381 *et seq.*, on behalf of her son, H.C., is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court REVERSES and REMANDS the decision of the Commissioner for further proceedings not inconsistent with this decision.

## I. PROCEDURAL HISTORY

Plaintiff, on behalf of her child, H.C., filed her initial application for Supplemental Security Income benefits on June 29, 2004, alleging an onset date of May 26, 2004 (Tr. 58). The initial application was denied on February 11, 2005 (Tr. 51-53). Plaintiff filed a request for

reconsideration on April 1, 2005 (Tr.. 49), which was denied on October 24, 2005 (Tr. 45-47).[1]

Plaintiff filed a second application for Supplemental Income benefits on May 9, 2006, again alleging

an onset date of May 26, 2004 (Tr. 54-57).  Plaintiff claims H.C. suffers from attention deficit

hyperactivity disorder ("ADHD"), asthma, Bipolar Disorder, and Asperger's Syndrome.  Plaintiff's

second application for benefits was denied initially and upon reconsideration (Tr. 13).

Plaintiff timely requested and was granted a hearing via video before Administrative Law

Judge Michael J. Cummings (the "ALJ") (Tr. 31-35, 44).  On July 24, 2008 Plaintiff and H.C.

appeared with counsel and testified (Tr. 672-98).  On August 28, 2008, the ALJ issued a written

decision denying Plaintiff's application (Tr. 13-23). Thereafter, Plaintiff filed a request for review

of the ALJ's decision to the Appeals Council (Tr.  670-71).  The Appeals Council denied Plaintiff's

request (Tr. 6), thereby making the ALJ's decision the final decision of the Commissioner.  On

appeal, Plaintiff claims that the ALJ's decision is not supported by substantial evidence.

## II.  EVIDENCE

### A.  Personal and Educational Evidence

H.C. was born on January 12, 2001, and was seven years old at the time of the ALJ's

determination (Tr. 16).  H.C. has a history of behavioral and academic problems in school.  In an

evaluation completed by H.C.'s preschool teacher, Ms. Roosa, she commented that H.C. showed

difficulty with controlling his behavior, exhibited signs of frustration, and at times refused to

participate in activities preferring to do other things in the classroom (Tr. 537-38).  The ALJ also

noted H.C.'s defiant behavior in preschool by acknowledging that he was removed from preschool

---

[1]On June 30, 2008, Plaintiff filed a request to reopen this claim (Tr. 98).  Plaintiff's
counsel also raised this issue to the ALJ during the hearing (Tr. 677-80).

for striking a teacher (Tr. 20).  Thereafter, H.C. attended Conneaut Area City Schools for most of his kindergarten year.[2]  His teacher, Ms. Kristin Tobias, remarked that she was concerned about his academic progress and "decline in learner qualities," however, she also expressed that it was a pleasure having him in her class (Tr. 506).   The Conneaut Area City School District evaluated H.C.'s academic abilities in December of 2006 (Tr. 499-503).  On January 23, 2007, his school determined that H.C. did not qualify as a student with a disability (Tr. 494, 550), and promoted him to the first grade (Tr. 498).

Ms. Drummond, H.C.'s first grade teacher, also observed H.C.'s behavioral and academic problems (Tr. 136-40).  Throughout H.C.'s first grade year she indicated such observations on H.C.'s progress reports (Tr. 136-40).  For example, she consistently rated H.C.'s reading and writing skills as "N" for needs support at home and school (Tr. 136-38).  Ms. Drummond also repeatedly expressed concern regarding H.C.'s behavior, stating that he "had a great deal of difficulty talking out of turn, not staying seated, and using a classroom voice," and always required the support of an adult aid (Tr. 140).  In November of 2007, the Conneaut Area City School District reevaluated H.C. (Tr. 652).  This time, the school concluded that H.C. "met the eligibility criteria [to qualify] as a student with an other health impairment due to his ADHD" (Tr. 668).

## B.  Medical Evidence

H.C. has been diagnosed with asthma, ADHD, Bipolar Disorder, and Asperger's Syndrome (Tr. 16, 592-95, 640-43).  He has had continual problems with his asthma since a young age (Tr. 161, 193, 218, 602-03).  When H.C. was four years old he underwent a psychological evaluation by

---

[2]H.C. attended Ashtabula Area City Schools for the first quarter of his kindergarten year (Tr. 483-88, 492-93).  He then transferred to Conneaut Area City Schools for the remaining three quarters of his kindergarten year (Tr. 499).

consultative psychologist, Dr. Richard Halas (Tr. 168-71).  Dr. Halas opined that H.C.'s overall

intellectual abilities were within normal limits based on his scores on the Wechsler Preschool and

Primary Scale of Intelligence III tests (Tr. 170).  However, Dr. Halas noted that H.C. displayed high

levels of anxiety, seemed unfocused and inattentive, and had limited social and emotional skills due

to his ADHD (Tr. 169-71).

Between November of 2004 and January of 2005, three state agency medical sources[3]

reviewed H.C.'s medical record and concluded that his ability to relate to others was markedly

impaired (Tr. 192).  Later, in May of 2005, psychiatrist Krishna Devulapalli conducted an initial

psychiatric evaluation on H.C. (Tr. 324-25).  Dr. Devulapalli opined that H.C. was suffering from

ADHD and oppositional defiant disorder (ODD) (Tr. 325). Dr. Devulapalli noted that Plaintiff

expressed concern over H.C.'s aggressive behaviors and his inability to get along with others (Tr.

324-25). Eventually, Dr. Devulapalli prescribed medication to help Plaintiff better manage H.C.'s

behavior.  In October of 2005, another state agency medical source, Dr. Nancy McCarthy, reviewed

H.C.'s medical record to render an opinion regarding his disability status (Tr. 256-60).  At that time,

Dr. McCarthy opined that H.C. did not have any marked limitations, and therefore did not meet any

listing (Tr. 256-60).  The record shows that Dr. Devulapalli continued to treat H.C. from 2005

through the date of the hearing.  Dr. Devulapalli diagnosed H.C. with Bipolar Disorder in May of

2006 (Tr. 322).

In May of 2007, Dr. Devulapalli referred H.C. to pediatric neurologist, Dr. Morris

Levinsohn, to conduct a neurological exam on H.C.  (Tr. 592).  Dr. Levinsohn opined that H.C.

---

[3]The three state agency medical sources were Melissa Hall, a speech and language
pathologist (11/04), Carl Tishler, a psychologist (1/05), and Kamala Saxena, a medical doctor
(1/05) (Tr. 191).

suffered from extreme degrees of irritability beyond the scope of ADHD, suggesting that he had a mood dysregulating disorder (Tr. 594). He also remarked that Plaintiff's incarceration for six months, which forced H.C. to live with his maternal grandmother during such time, could have impacted H.C.'s aggressive behavior (Tr. 594). Dr. Levinsohn examined H.C. several times between 2007 and 2008 (Tr. 590-95, 617-24). Dr. Levinsohn's most recent correspondence in the record is a letter dated February 6, 2008, written by Dr. Levinsohn (Tr. 617-18). In it, Dr. Levinsohn commented that while H.C.'s medications proved to be beneficial, he remained concerned about H.C.'s academic performance (Tr. 617). Therefore, he recommended changes to H.C.'s schooling (Tr. 617-18).

### III.  LEGAL FRAMEWORK FOR CHILDHOOD SSI CASES

An individual under age eighteen will be considered disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i). Childhood disability claims involve a three-step process in evaluating whether the child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ must determine whether the claimant is working. If not, the ALJ moves to the second step and determines whether the claimant has a severe mental or physical impairment. Third, the ALJ must consider whether the claimant's impairments meet or equal the listings. An impairment can equal the listings medically or functionally. *Id.* The regulations set out six domains that an ALJ must consider when determining whether the claimant functionally meets the listings:

(1)    Acquiring and using information;

(2)    Attending and completing tasks;

(3)    Interacting and relating with others;

(4)      Moving about and manipulating objects;

(5)      Caring for yourself; and,

(6)      Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  In order to establish a functional impairment equal to the listings, the claimant must show an extreme limitation in at least one domain, or a marked impairment in two domains.  20 C.F.R. § 416.921a(d).  The regulations define marked and extreme impairments:

> We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities....[it] also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities....[it] also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

Additionally, the regulations mandate the ALJ to consider certain evidence in the record. During an evaluation of a disability claim for a child, the regulations require the ALJ to give consideration to information from the child's teachers.  20 C.F.R. § 416.926a(a).  The regulations also direct the ALJ to review information from the child's preschool program and school.  20 C.F.R. § 416.926a(2)(ii-iii).  When determining the child's functional abilities, the regulations also mandate the examiner to look at how the child performs daily activities in comparison to other children the same age as the child.  20 C.F.R. § 416.926a(b)(3)(i-ii).

Furthermore, the ALJ must consider medical opinion evidence in the record. 20 C.F.R. § 416.927. The opinions of a treating physician should be given controlling weight when they are well-supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 416.927(d)(2). If the ALJ determines that the opinions of a treating physician should not be given controlling weight, he must articulate good reasons for the weight actually assigned to such opinions. *Id.* In addition, the examiner must consider the opinions of non-examining sources, such as state agency medical consultants, when determining whether the claimant is disabled. 20 C.F.R. § 416.927(f)(2)(i-ii). "Unless the treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of [state agency medical consultants]". *Id.*

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Secretary of Health and Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility.  *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Secretary of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  ANALYSIS

After reviewing the record, the ALJ determined that H.C. was not disabled.  On appeal, Plaintiff raises several errors as potential reasons to remand.  To begin, Plaintiff argues that the ALJ improperly evaluated whether H.C. functionally equaled the listings by failing to consider or credit the findings of H.C.'s treating physician or those of three state agency medical sources, and by mischaracterizing the evidence which the ALJ did rely upon in making his decision.  Next, Plaintiff argues that the ALJ erred by failing to consider whether H.C.'s diagnosed Bipolar Disease or Asperger's Syndrome were severe impairments, and whether these impairments in conjunction with his ADHD medically equaled the criteria to satisfy other listings.  Plaintiff also maintains that her credibility was not properly weighed by the ALJ.  Lastly, Plaintiff contends that upon remand, this Court should order a different ALJ to review H.C.'s application, alleging that the former ALJ was biased against Plaintiff and her attorney.  Finding that two of Plaintiff's arguments have considerable merit, the undersigned remands this case to the ALJ for further review.

A.  <u>ALJ's Examination of Whether H.C.'s Impairments Medically or Functionally Met the</u>
<u>Listings</u>

In the case *sub judice*, the ALJ applied the three step process in deciding Plaintiff's claim. Because H.C. was a preschooler as of the date of his application, the first step of the evaluation process, determining whether the child worked, was moot (Tr. 16).  At step two, the ALJ determined that H.C.'s asthma and ADHD were both severe impairments (Tr. 16).  However, at step three, the ALJ found that H.C.'s impairments did not medically or functionally equal the listings (Tr. 16 - 23). In regards to H.C.'s failure to medically meet the listing, the ALJ explained that H.C.'s asthma did not satisfy the listing; however, the ALJ did not make a specific finding as to whether H.C.'s ADHD medically met the listing.  During his analysis of whether H.C. functionally equaled the listings, the ALJ concluded that H.C. did not meet the listings because he had a "less than marked" limitation in the domains of attending and completing tasks, interacting and relating with others, and health and physical well-being (Tr. 16 - 22), and no limitations in the remaining domains (Tr. 16 - 22).

On appeal, Plaintiff only contests the ALJ's determination of whether H.C. functionally met the listings, with regard to the ALJ's findings in three domains: 1) acquiring and using information; 2) attending and completing tasks; and 3) interacting and relating with others (ECF No. 19).  For the reasons stated below, the Court finds that the ALJ's decision was not supported by substantial evidence.

1.  Whether H.C.'s Impairments Functionally Equaled The Listings

a.  Attending and Completing Tasks

This domain examines how well the child is able to focus, maintain attention, and begin, carry through and finish activities.  20 C.F.R. § 416.926a(h).  It also measures the child's pace in completing activities and the ease with which the child is able to change activities.  *Id.*  Examples

9

of limited functioning in this domain include repeatedly becoming sidetracked or frequently interrupting others, becoming easily frustrated on tasks, and requiring extra supervision to remain engaged in an activity. 20 C.F.R. § 416.926a(h)(3)(i)-(v). Plaintiff argues that the ALJ failed to properly evaluate H.C.'s limitations in this domain. Although the ALJ acknowledged H.C.'s ADHD diagnosis and his tendencies to be impulsive and hyperactive, he nevertheless found that H.C.'s limitation in this domain was "less than marked" (Tr. 19). In reaching this decision, the ALJ explained that H.C.'s medication appeared to help control his symptoms, and that his kindergarten teacher rated his problem as "obvious" at most (Tr. 19). The ALJ referenced three documents to support his rationale: 1) an evaluation by consultative psychologist, Dr. Richard Halas; 2) pharmacological management progress notes from the Community Counseling Center (the "CCC"); and 3) an evaluation completed by H.C.'s kindergarten teacher, Ms. Tobias (Tr. 19).

Plaintiff claims that neither the records from Dr. Halas, nor the progress notes from the CCC support the ALJ's decision (ECF No. 19, pg 16 - 17). For example, Plaintiff pointed to portions of Dr. Halas' evaluation which state that H.C. seemed "unfocused and inattentive" (Tr. 169). In addition, Dr. Halas reported that H.C.'s receptive and expressive functions were below average (Tr. 171). Plaintiff also identified progress notes from the CCC showing that H.C. had problems with keeping his focus (Tr. 643). For instance, progress notes dated in November of 2007 indicate that H.C. was "not able to concentrate or pay attention" (Tr. 644).

Plaintiff also contends that the findings of H.C.'s treating pediatric neurologist, Dr. Levinsohn, prove that H.C. had a marked impairment in this domain. In February of 2008, Dr. Levinsohn expressed great concern about H.C.'s academic abilities due to his medical conditions (Tr. 617). The doctor strongly urged H.C.'s teachers to make significant changes to his schooling

10

in order to help the child succeed (Tr. 617).  Dr. Levinsohn's recommendations were for H.C. to be given a reduced workload, expanded times for completing projects and tasks, an adjusted grading system, and in-school counseling (Tr. 617).  The ALJ failed to acknowledge these recommendations in evaluating H.C.'s limitations in this domain (Tr. 18-19).  Likewise, Defendant's brief also failed to rebut the import of Dr. Levinsohn's recommendations to the analysis of H.C.'s limitation in this domain, or to refute any of the other arguments raised by Plaintiff regarding the ALJ's assessment of H.C.'s impairments in this domain (ECF No. 22).

Based on a review of the record, the Court finds that the ALJ's decision was not supported by substantial evidence.  To begin, while the ALJ commented that the medication which H.C. began taking in May of 2005 improved his ability to concentrate and focus, the evidence the ALJ cited, an evaluation by Dr. Halas and progress notes from the CCC, do not fully support this statement (Tr. 19).  Because Dr. Halas' report was written in January of 2005, prior to the date that the ALJ alleged H.C. began taking medication for his ADHD, it is impossible for Dr. Halas' report to support the notion that H.C.'s medication was helping him to focus and concentrate (Tr. 168-71).  In fact, as Plaintiff correctly noted, portions of Dr. Halas' report indicated that H.C. was restless, impulsive, unfocused, inattentive, and showed signs of a hyperactivity disorder and ADHD (Tr. 168-71).  While the progress notes from the CCC cited by the ALJ reflect that the medication was helping to improve H.C.'s condition, the records also reveal that H.C.'s medical team was still actively in the process of finding the correct prescription and dosage to manage H.C.'s array of health problems (Tr. 304-39).  For example, in the progress notes cited by the ALJ, dated June 20, 2007, Plaintiff reported that H.C. was doing better after switching medications (Tr. 307) But, later that year, in October of 2007, progress notes show that H.C.'s doctor was considering changing his medication because the prior

11

medication was no longer working (Tr. 644), and H.C. was having problems concentrating and keeping focused (Tr. 643-44). Although treating neurologist, Dr. Levinsohn acknowledged that H.C.'s medications were impacting him in a positive way, the doctor emphasized that he remained concerned about H.C.'s academic performance (Tr. 617). The ALJ's opinion gives no indication that he considered these later records showing that H.C.'s medication was no longer improving his ability to concentrate and focus (Tr. 18-19).

The ALJ's treatment of Dr. Halas' evaluation and the progress notes from the CCC was improper. The ALJ cannot "pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision." *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004); *Williams v. Heckler*, No. 85-1842, 1986 WL 18076, at *6 (6th Cir. Oct. 30, 1986) (Table) (finding that an ALJ may not only credit the portions of the medical evidence to which he agrees). As previously explained, while there are some progress notes from the CCC showing that H.C.'s medications were beneficial (Tr. 304-39), later reports show that despite his medication regimen, H.C. still had problems focusing and paying attention (Tr. 643-44). Because the ALJ made no mention of these records it is unclear to the Court whether the information was purposely ignored, overlooked, or validly discredited. Furthermore, the ALJ mischaracterized Dr. Halas' findings. His report does not indicate that H.C. was taking medication for his ADHD, or that any medication was helping to improve H.C.'s symptoms (Tr. 168-71).

The ALJ also failed to articulate what weight if any he assigned to the opinions of H.C.'s treating pediatric neurologist, Dr. Levinsohn, in evaluating H.C.'s limitation in this domain (Tr. 18-19). The recommendations Dr. Levinsohn offered regarding H.C.'s schooling bear significant importance to the skills and abilities evaluated in this domain. The fact that Dr. Levinsohn

12

suggested that H.C. be given a reduced work load and expanded times to complete tasks (Tr. 617-18) directly reflected on the child's ability to begin, carry through, and finish activities. It also reflected on H.C.'s ability to keep pace with his work. Yet, there is no discussion of Dr. Levinsohn's opinions in the ALJ's analysis of H.C.'s impairment in this domain (Tr. 18-19). As H.C.'s treating neurologist, Dr. Levinsohn's opinions should have been given considerable weight because the objective medical evidence affirmed Dr. Levinsohn's findings that H.C. suffered from several mental health impairments which had a negative effect on his ability to focus (Tr. 589-97, 617-24). *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004); 20 C.F.R. § 416.927(d)(2). The Social Security regulations mandate the ALJ to provide good reasons when deciding to assign less than controlling weight to the opinions of a treating physician. *Id.* The ALJ's three sentence analysis explaining his ruling in this domain fails to acknowledge Dr. Levinsohn's findings or the recommendations he gave regarding H.C.'s schooling (Tr. 18-19). It also fails to state any reason, good or otherwise, why the ALJ did not consider Dr. Levinsohn's opinions in examining the severity of H.C.'s limitation in this domain (Tr. 18-19). "It is more than merely helpful for the ALJ to articulate reasons ... for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review." *Boruff v. Astrue*, 648 F. Supp. 2d 932, 942 (E.D. Mich. 2009) citing *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 2003) (internal quotations omitted). As our sister court noted in *Boruff*, when the ALJ fails to mention rejected evidence, it is impossible for the reviewing court to determine whether the ALJ ignored the evidence or whether the ALJ had a sufficient basis for discrediting such evidence. *See id.* citing *Hopkins v. Comm'r of Soc. Sec.*, No. 1:07CV964, 2009 WL 1360222, at *14 (S.D. Ohio May 14, 2009) (indicating that the ALJ "must consider all the record evidence and cannot 'pick and choose' only

13

the evidence that supports his position").

The Court also notes that the ALJ appears to have ignored, without any persuasive justification, a significant amount of evidence in the record that may support the contention that H.C. had a severe limitation in this domain as opposed to a less than marked limitation, which should be considered on remand. *See Matos v. Comm'r of Soc. Sec.*, 320 F. Supp. 2d 613 (N.D. Ohio 2004); *see also Boruff*, 648 F. Supp. 2d at 942. Notably, many of the examples listed in the regulations to show a limitation in this domain appear within the record. For example, many of H.C.'s teachers commented that H.C. had problems remaining on task, controlling his behavior, and working independently without the assistance of a teacher or aid, therefore requiring extra supervision (Tr. 140, 506, 537-38). While the Court acknowledges that the examples listed in the regulation do not necessarily describe marked or extreme limitations in the domain, H.C.'s behavior exhibited many of the examples listed. As such, his conduct should have alerted the ALJ to give this behavior significant consideration in determining H.C.'s limitation in this domain. *Cf. Boruff*, 648 F. Supp. 2d at 943 (ruling that the plaintiff's failure to display the listed behavior constituted evidence that the plaintiff did not have a limitation).

b.  Interacting and Relating with Others

Next, Plaintiff claims that the ALJ erred in deciding that H.C. had a "less than marked" limitation in the domain of interacting and relating with others (Tr. 20). This domain examines how well the child initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others and complies with rules. 20 C.F.R. § 416.926a(i). Examples of limitations in this area include: when the child has no close friends, has difficulty playing games or sports with rules, or has difficulty communicating with others or

14

speaking intelligibly. 20 C.F.R. § 416.926a(i)(3)(i-vi). Many of the problems identified above with regard to the ALJ's decision in the domain of attending and completing tasks are repeated in the ALJ's determination of H.C.'s limitation in this domain. Although the ALJ seemingly dedicated more attention to his analysis in this domain, as evidenced by the paragraph in which he explained the support for his conclusion (Tr. 20), his analysis here also falls short of what was required.

The ALJ's discussion began by acknowledging H.C.'s long history of irritable and defiant behavior, both at home and in school settings (Tr. 20). Again, the ALJ commented that H.C. was taking medications to help control his symptoms, and that they appeared to produce positive effects (Tr. 20).[4] He also commented that H.C.'s maternal grandmother and father both seemed to be able to control the child without problem (Tr. 20). In addition, the ALJ credited H.C.'s anger management class, Leaps and Bounds, for helping H.C. improve his behavior (Tr. 20). After stating that most of H.C.'s speech was intelligible, the ALJ cited four records: H.C.'s school records from Ashtabula Area City Schools, two documents containing evaluations of H.C. written by Dr. Levinsohn, and H.C.'s school records from Conneaut Area City Schools (Tr. 20). Plaintiff argues that neither Dr. Levinsohn's findings, nor the school records support the ALJ's decision.

Plaintiff's argument is well-taken. The records referencing Dr. Levinsohn mostly consist of letters written by Dr. Levinsohn addressed to Dr. Devulapalli, another one of H.C.'s doctors (Tr. 589-97, 616-24). In Dr. Levinsohn's first set of letters dated in May and June of 2007, he informed Dr. Devulapalli that H.C.'s symptoms were "well beyond the scope of simple ADHD," and that H.C.

---

[4]In his discussion of this domain, the ALJ failed to cite any record showing that H.C.'s medication was improving his condition. The Court assumes that the ALJ relied upon the same evidence that he cited when he made this statement while discussing the domain of attending and completing tasks. Under that assumption and for the reasons previously addressed, the Court finds that the ALJ's statement is not fully supported by the record.

had a history of violent and destructive behavior with the tendency to lash out at others (Tr. 594).

In Dr. Levinsohn's second set of letters dated in the end of 2007 to the beginning of 2008, he again

noted H.C.'s complex health condition (Tr. 616-24).  For example, in August of 2007, in addition

to acknowledging that H.C. communicated well, as the ALJ expressed, Dr. Levinsohn also stated

that H.C. "present[ed] with an extremely difficult diagnostic therapeutic dilemma" (Tr 623-24).

Defendant argues that the ALJ did not credit Dr. Levinsohn's findings because he did not

offer any opinions about H.C.'s functioning in this domain, and because his findings were mostly

based upon Plaintiff's statements (ECF No. 22, pg 15).  The Court rejects Defendant's arguments.

First, Dr. Levinsohn did offer opinions regarding H.C.'s limitations in the domain of interacting and

relating with others.  Several of Dr. Levinsohn's letters referenced H.C.'s aggressive and violent

behavior towards others (Tr. 592-94, 623) and his mood disorder (Tr. 617, 623).  Second, Dr.

Levinsohn's notes do not solely rely upon Plaintiff's statements explaining H.C.'s symptoms.

Instead, the letters indicate that the doctor performed several neurological evaluations on H.C. in

forming his opinion (Tr. 590, 592, 619, 621).  Additionally, Dr. Levinsohn reported that he reviewed

evaluations completed by H.C.'s teachers in reviewing H.C.'s file (Tr. 590).  In his correspondence

dated February 6, 2008, he stated that he had been seeing H.C. since May of 2007 (Tr. 617).  Thus,

contrary to Defendant's suggestion, Dr. Levinsohn had an objective basis for his conclusions, and

as one of H.C.'s treating physicians, the ALJ was compelled to consider Dr. Leventhal's opinions.

*See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004); 20 C.F.R. § 416.927(d)(2).

Moreover, the regulations demand the ALJ to provide "good reasons" when the ALJ determines to

assign less than controlling weight to such opinions.  *Id.*  Although the ALJ cited to Dr. Levinsohn's

findings in support of his decision, he did not state "good reasons" for his failure to accord

16

controlling weight to Dr. Levinsohn's findings (Tr. 13 - 23).  It was especially important for the ALJ to do so because the objective evidence in the record supports Dr. Levinsohn's conclusions.

The school records from Ashtabula Area City Schools also fail to fully support the ALJ's decision.  As Plaintiff pointed out, in an evaluation conducted by the Ashtabula Area City Schools, H.C. was rated "needs support at home and school" in 14 categories (Tr. 491).  The categories rated were significantly similar to the functions examined in the domain of interacting and relating with others.  For example, the school evaluation examined whether the child followed directions and classroom rules, respected others and adult authority, worked well in groups, or had positive relations with others (Tr. 491).  H.C.'s teacher rated him as "needs improvement" in all of these categories for both the third and fourth semesters of the school year (Tr. 491).

Even more telling of the ALJ's error, was his omission of the findings of three state agency medical sources who opined that H.C.'s limitations were marked in this domain (Tr. 191-95). Defendant's brief admitted that three state agency medical sources concluded that H.C. was markedly impaired in this domain, but dismissed the validity of their findings by stating that the ALJ instead chose to adopt the findings of the other state agency psychologists who listed H.C.'s limitation in this domain as "less than marked" (ECF No. 22, pg 15).  Defendant also commented that the evidence in the record affirmed the conclusions of these psychologists.  However, that statement is not entirely true.  For instance, Defendant referenced the psychologists' notes stating that while H.C. had recognizable social problems, he was not violent (ECF No. 22, pg. 15; Tr. 257). To the extent that the ALJ or Defendant relied upon this statement to sustain the finding that H.C. was not markedly impaired in this domain, it is controverted by the record.  Dr. Levinsohn commented that H.C. displayed aggressive behavior, temper tantrums, and at times kicked his

mother (Tr. 623). Even the ALJ himself acknowledged that H.C. had a history of oppositional and defiant behavior, including violent behavior which resulted in his removal from preschool for striking a teacher (Tr. 20). Therefore, contrary to the opinions of the psychologists relied upon by the ALJ and Defendant, at times H.C.'s behavior was violent.

While the ALJ acknowledged his duty to consider all medical opinions made by non-examining state agency physicians pursuant to 20 C.F.R. § 416.927(f) (Tr. 23), he failed to explain if or why he rejected the findings of the three state agency medical sources who found H.C. markedly impaired in this domain. From the explanation given in the final page of his opinion, it appears that the ALJ only credited the findings of the two state agency psychologists who opined that H.C.'s limitation was less than marked (Tr. 23, 255-60). In fact, the ALJ continued by stating that he gave such opinions significant weight (Tr. 23). Yet, he made no mention of the three other state agency medical sources who concluded that H.C. was markedly impaired in this domain (Tr. 189-95).

Because the ALJ failed to acknowledge the findings of the three medical sources who found H.C. markedly impaired in this domain, this Court is unable to determine whether the ALJ overlooked these opinions or discredited them. If the ALJ overlooked these opinions, then remand is warranted due to the ALJ's failure to carry out his duties pursuant to 20 C.F.R. § 416.927(f). On the other hand, if the ALJ did consider the opinions and decided to discredit them, he should have articulated reasons for rejecting such opinions, as the Sixth Circuit court has recognized that the ALJ may not simply "credit only those portions of the medical evidence which it approves." *Williams v. Heckler*, No. 85-1842, 1986 WL 18076, at *6 (6th Cir. Oct. 30, 1986) (Table). It is impossible for this Court to conduct a meaningful review without knowing the reason why these opinions were

not credited by the ALJ. *See Hurst*, 753 F.2d at 519. Accordingly, for the reasons herein stated, substantial evidence does not support the ALJ's decision finding H.C. less than markedly impaired in this domain, and remand is proper.

### c. Acquiring and Using Information

This domain considers how well the claimant learns information and how well the claimant uses the information learned. 20 C.F.R. § 416.926a(g). The regulation gives examples of limitations a child might have in this domain. Examples include the inability to rhyme words, difficulty solving mathematics questions, and difficulty recalling important things learned the previous day at school. 20 C.F.R. § 416.926a(g)(3). In the instant matter, the ALJ found that H.C. had no limitation in this domain (Tr. 18). While the ALJ acknowledged that H.C. had a low average intellectual functioning, he concluded that H.C.'s IQ score of 88 showed that he was only slightly behind other students his age (Tr. 18). In support of his determination, the ALJ referred to three evaluations in the record: an Individualized Education Program ("IEP") report completed by H.C.'s teachers at Conneaut Area City Schools, a psychological evaluation by Dr. Richard Halas, and an evaluation completed by H.C.'s kindergarten teacher, Ms. Tobias.

Although Plaintiff argues that the ALJ erred in concluding that H.C. had no limitation in this domain, any error committed by the ALJ was harmless. While the records which Plaintiff relies upon may confirm that H.C. has some limitation in this area, Plaintiff failed to cite any specific evidence showing that H.C.'s impairment was marked or extreme as defined by the regulation (ECF No. 19, pg. 15-16). The IEP from Conneaut Area City Schools indicates that H.C.'s IQ was within the low average range, even though his scores in math and writing were 20% and 68% respectively; for reading he was only one level behind where most students tested (TR. 648). The report also

notes that H.C. qualified for special services as a student with an "other health impairment" (Tr. 648).  Dr. Halas' report shows that H.C. scored within the average range on the Wechsler Preschool and Primary Scale of Intelligence III tests (Tr.170-71).  Lastly, Ms. Tobias' questionnaire rates H.C.'s problems in this area as slight (Tr. 543), although she expressed concern regarding his academic progress (Tr. 506).  Despite the fact that these records reveal that H.C. exhibited some problems in this domain, none of the evidence suggests that his limitations were severe.  *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 833 (6th Cir. 2009) (ruling that the child claimant had a less than marked limitation in acquiring and using information even though the child's academic performance was in the low average range and his test scores ranked him in the 26th percentile in reading, 31st percentile in math, 33rd percentile in written language, and 23rd percentile overall).  Accordingly, any alleged error committed by the ALJ in rating H.C. as having no limitation in this domain, instead of finding that his limitations were less than marked, was harmless.  The regulations do not recognize  limitations that are "less than marked" when evaluating whether the child's impairments functionally equal the listings.  *See* 20 C.F.R. § 416.926a(d).

2. Whether H.C.'s Impairments Medically Equaled the Listings

At step two of the sequential evaluation process, the ALJ found that H.C. had two severe impairments: asthma and ADHD (Tr. 16). Plaintiff maintains that the ALJ erred by failing to identify H.C.'s Bipolar Disorder and Asperger's Syndrome as severe impairments (ECF No. 19, pg 10).  Dr. Devupalli diagnosed H.C. with Bipolar Disorder NOS in May of 2006 (Tr. 322), and Asperger's Syndrome in August of 2007 (Tr. 340).  The ALJ failed to mention either diagnosis in his opinion (Tr. 13-23).

Although the ALJ found that H.C.'s asthma and ADHD were both severe impairments, the ALJ found that neither impairment met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, at step three (Tr. 16).  The ALJ provided a detailed explanation of why H.C.'s asthma did not meet the listing for asthma (Tr. 16); but, he failed to state any reason explaining why H.C.'s ADHD did not meet the listing for ADHD (Tr. 16), or whether H.C.'s combined impairments of ADHD, Bipolar Disorder, and Asperger's Syndrome met the listing for ADHD.  Plaintiff maintains that the ALJ's alleged oversight constitutes reversible error because he failed to analyze whether the claimant's ADHD met the listing for the ADHD, mood disorders, or autism or other developmental disorders (ECF No. 19, pg. 11).  In response, Defendant contends that Plaintiff failed to show proof satisfying each criteria of the listings (ECF No. 22, pg 11-12).

Because the Court has already determined that remand is proper, it is unnecessary at this juncture for the Court to definitively state whether the ALJ erred by failing to address whether H.C.'s impairments met the above-mentioned listings.[5]  Instead, on remand, the Court urges the ALJ to expressly address what impact, if any, H.C.'s Bipolar Disorder and Asperger's Syndrome had on his abilities, and whether H.C.'s impairments, singularly or combined, meet or medically equal the listings for ADHD and mood disorders, considering the medical evidence in the record portraying H.C.'s symptoms with regard to both medical conditions (Tr. 589-97, 616-24).  Given the ALJ's additional opportunity to review the record, the Court finds that such review would be proper and beneficial.

---

[5]The Court recognizes that the ALJ's failure to discuss H.C.'s multiple impairments does not mean that he did not consider their combined effect.  *Simons v. Barnhart*, 114 F. App'x 727 (6th Cir. 2004).

21

B. Plaintiff's Credibility

Next, Plaintiff challenges the ALJ's determination that Plaintiff's statements regarding the intensity, persistence and limiting effects of H.C.'s symptoms were not credible (Tr. 17).  This circuit follows a two-part test when evaluating a claimant's symptoms of disabling pain.  *SSR 96-7p*; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 852-53 (6th Cir. 1986).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment.  *Id.* Second, if such an impairment is found, the ALJ must assess the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.*

Additionally, it is well-established that the ALJ's credibility determinations are to be given great weight.  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).  Yet, the ALJ is not permitted to make credibility determinations based solely upon "intangible or intuitive notion[s] about an individual's credibility."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  Social Security Ruling 96-7p states in relevant part:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain *specific reasons for the finding on credibility*, supported by the evidence in the case record, and *must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight*.

SSR 96-7p (emphasis added).  Thus, blanket assertions regarding whether the claimant is or is not credible do not satisfy the standards established by the ruling.  *Rogers*, 486 F.3d at 248.

In the present case, it was particularly important for the ALJ to carefully weigh Plaintiff's credibility because the claimant, H.C., was seven years old at the time of the hearing (Tr. 690).

Thus, it was appropriate for the ALJ to consider the testimony of his mother, Gipson, in determining whether his symptoms were disabling.  *See Hickman ex rel. v. Astrue*, No. 7:07-CV-1077, 2010 WL 2985968, at *12 (N.D.N.Y. July 27, 2010) ("If the child claimant is unable adequately to describe his symptoms, the ALJ must accept the description provided by testimony of the person most familiar with the child's condition, such as a parent.").  In doing so, the ALJ retained the obligation make specific findings regarding Plaintiff's credibility and to state the reasons for such findings. *See id.*

Having reviewed the ALJ's decision in its entirety, the Court finds that the ALJ did not provide sufficient justification for discrediting Plaintiff's credibility.  The ALJ summarized Plaintiff and H.C.'s testimony at the hearing as follows:

> Ms. Gipson testified at the hearing that [H.C.] has difficulty in school because of a short attention span, poor listening skills, deficient academic skills, and inability to control his anger or behavior.  She testified that he performed poorly in all classes and earned N's (needs improvement), but was promoted to the second grade.  Hunter testified that he enjoys school...[it] has taught him not to fight with other children.  He stated that, when he gets angry, he talks with the teacher or takes a walk.  He stated that he also enjoys riding skateboards, riding his bike, and playing video games.

(Tr. 17).  In explaining the weight given to Plaintiff's credibility, the ALJ stated:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.

(Tr. 17).  As read, nothing in either of these paragraphs explains why the ALJ decided to discredit Plaintiff.  Instead, the ALJ summarily determined that Plaintiff was not credible without offering any specific reasons for his decision or citing any evidence in the record to contradict her testimony

23

(Tr. 17).  Such conclusory credibility determinations do not provide this Court with sufficient basis to review the ALJ's decision and determine whether he acted in accordance with prescribed rules and regulations.  As a result, this Court also remands the case for a determination of Plaintiff's credibility, detailing specific reasons supporting the weight assigned to her testimony.  *See Olive v. Comm'r of Soc. Sec.*, No. 3:06-CV-1597, 2007 WL 5403416, at *9 (N.D. Ohio Sept. 19, 2007) (case remanded where the ALJ failed to state reasons for disfavoring the plaintiff's credibility, but merely stated that "the claimant's allegations regarding her limitations are not totally persuasive for the reasons in the body of the decision"); *see also Combs v. Astrue*, No. 07-147, 2008 WL 4500103, at *5 (E.D.Ky. Sept. 30, 2008) (remanding for the ALJ's failure to state any explanation of the plaintiff's credibility finding); *Hickman*, 2010 WL 2985968 at *12-13 (remanding for the ALJ's failure to cite evidence in the record that contradicted the plaintiff's testimony); *Ragan v. Barnhart*, 89 F. App'x 160 (10th Cir. 2004) (remanding because the ALJ's discussion of the plaintiff's credibility was conclusory and not linked to any specific medical evidence).  Although Defendant offered several possible reasons why the ALJ could have discounted Plaintiff's credibility, the ALJ himself failed to state any such reasons.  As such, this Court is not compelled to accept the post hoc rationalizations offered by Defendant.  *See Roper v. Sec'y of Health & Human Servs.*, 769 F. Supp. 243, 247-48 (N.D. Ohio 1990); *see also S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947).

## C.  ALJ's Alleged Bias and Predisposition

Finally, Plaintiff requests this Court to order a new ALJ to review Plaintiff's file on remand on the grounds that the presently assigned ALJ was biased against Plaintiff's counsel and case.  At the beginning of the hearing, the ALJ forewarned Plaintiff's counsel against performing specific legal conduct which the ALJ had previously witnessed from Plaintiff's counsel in prior hearings (Tr.

24

675-76).  The ALJ also expressed his distaste for certain cases which had been referred to him from Ashtabula, commenting that many of their records contain 1000 pages, only 50 of which are relevant to the case (Tr. 676). After making these comments, the ALJ advised Plaintiff that he would not hold anything against her, and that his comments to her counsel had nothing to do with her (Tr. 677).

"The court must start from the presumption that administrative adjudicators are unbiased, and that honesty and integrity exist among them." *Wells v. Apfel*, No. 99-5548, 2000 WL 1562845, at *6 (6th Cir. 2000) (Table).  The burden to show bias rests with the party making the assertion of bias. *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 364 (6th Cir. 2004).  This burden is high; the presumption of impartiality can be "overcome only with convincing evidence that a risk of actual bias or prejudgement is present." *Id.* citing *Navistar Int'l Transp. Corp. v. United States Environmental Protection Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991).

Although the Court can understand how the ALJ's comments could be construed as raising legitimate concerns about his objectivity in rendering a decision in Plaintiff's case, the ALJ's conduct did not rise to the level of bias, as "[n]either expressions of frustration nor curt behavior establish bias." *See Heffner v. Astrue*, No. 1:09 CV 1377, 2010 WL 3370480, at *11 (N.D. Ohio Aug. 24, 2010) citing *Collier*, 108 F. App'x at 364.  If Plaintiff felt that the ALJ had any predisposition or was biased against her case, the proper procedure would have been for her to request the ALJ to withdraw.  *Wells v. Apfel*, No. 99-5548, 2000 WL 1562845, at *6 (6th Cir. 2000) (Table) citing *Ginsburg v. Richardson*, 436 F.2d 1146, 1151 (3rd Cir. 1971).  Plaintiff did not raise this issue to the ALJ (Tr. 672-98) or to the Appeals Council (Tr. 670-71).  This failure constituted waiver of Plaintiff's right to object to the ALJ's alleged inappropriate conduct. *See Wells*, 2000 WL 1562845 at *6.  As a consequence, this Court denies Plaintiff's request for a new ALJ to hear her

case on remand.

## VI. <u>Decision</u>

For the foregoing reasons, the Magistrate Judge REVERSES and REMANDS the decision of the Commissioner to the Social Security Administration for further proceedings not inconsistent with this opinion.

<u>s/ Kenneth S. McHargh</u>
Kenneth S. McHargh
United States Magistrate Judge

Date: <u>November 1, 2010</u>